UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

KAREN SLATER, individually and on behalf of the ESTATE OF BEVERLY JEAN MAUCK, a deceased person, ALLEN MAUCK and PAMELA MAUCK, individually and RYAN REHBERG, PERSONAL REPRESENTATIVE on behalf of the ESTATE OF BRIAN MAUCK, a deceased person,

Plaintiffs,

v.

HAROLD W. CLARKE, KEVIN BURKE, individually, RICHARD RANGE, individually, WILLIAM LOCHRIE, individually, ERIN DONNELLY, individually, and JOHN DOES 1-10,

Defendants.

No. 3:10-cv-05822-RBL

ORDER ON DEFENDANTS' MOTION TO DISMISS UNDER FED R. CIV. P. 12(b)(2).
[Dkt. #28, 29].

THIS MATTER comes before the court on Defendants Burke, Donnelly, Lochrie, and Range's Motions to Dismiss for Lack of Personal Jurisdiction under Fed. R. Civ. P. 12(b)(2).[1] [Dkt. #s 28, 29].

On November 17, 2007, Daniel Tavares brutally murdered Beverly and Brian Mauck in their Washington home. Tavares is a convicted felon with documented extremely violent propensities. He was improperly and prematurely released from prison in Massachusetts and

---

[1] Defendants' Motions to Dismiss on other bases under Fed. R. Civ. P. 12(b)(6) will be addressed in a subsequent order.

ORDER - 1

absconded to Washington. [Plaintiffs' Complaint, Dkt. #1, p. 1, 2]. Tavares is currently serving life in prison in Washington State after pleading guilty to the Maucks' murders.

Plaintiffs are Karen Slater (mother of Beverly Mauck and personal representative of her estate), Pamela and Allen Mauck (parents of Brian Mauck), and Ryan Rehberg (personal representative of Brian Mauck's estate) on behalf of the deceased.

Defendants were all employees of the Massachusetts State government at the relevant times. Plaintiffs' complaint alleges that Defendant Sergeant Richard S. Range, of the Massachusetts Commonwealth Fusion Center ("CFC")[2], solicited and depended on Washington authorities to locate Tavares in Washington and then instructed them to leave him there. Defendant William Lochrie, an employee of the Massachusetts Department of Corrections Fugitive Apprehension Unit ("FAU"),[3] allegedly worked with Range to contact the FBI about Tavares.[4]

Defendant Erin Donnelly was a Worcester County Assistant District Attorney. She worked with the CFC and FBI to locate Tavares in Washington, but decided to not extradite him to Massachusetts. Defendant Kevin Burke was the Secretary of the Massachusetts Executive

---

[2] The Massachusetts Commonwealth Fusion Center provides statewide information sharing among local, state and federal public safety agencies and private sector organizations on matters of terrorism and public safety.

[3] The Massachusetts Department of Corrections, Office of Investigate Services, Fugitive Apprehension Unit is responsible for returning escapees to custody. The unit works closely with the Massachusetts State Police and FBI.

[4] There are some discrepancies between the dates in the Plaintiffs' complaint and those in documents obtained and submitted by the Plaintiffs. These are generally contained in dkt. #s 1, 45, 46, and 47.

Office of Public Safety and Security ("Executive Security").[5] He allegedly authorized Range and Lochrie's efforts to locate Tavares, and participated in the decision to leave him in Washington.

## I. PLAINTIFFS' COMPLAINT

Plaintiffs' complaint alleges that Defendants willfully failed to prevent Tavares from being improperly released from prison, and subsequently absconding to Washington. Plaintiffs allege Defendants knew of Tavares' danger, issued a warrant for his arrest, and located him in Washington. But Defendants then decided not to extradite Tavares to Massachusetts, and left him in Washington.

Plaintiffs allege that these decisions subjected the Maucks to unnecessary danger and harm, which resulted in the deprivation of their constitutionally protected rights to life, liberty, and bodily security. The parent Plaintiffs assert claims for loss of their right to the companionship, love, and affection of their children under the Fourteenth Amendment. Plaintiffs bring this action under 42 U.S.C. §§1983 and 1985 for monetary damages against Defendants Range, Lochrie, and Donnelly, in their individual and official capacities. They bring these actions against Range, Lochrie, and Donnelly for punitive damages in their non-municipal capacities. Plaintiffs seek declaratory relief against Defendants Clarke and Burke. Plaintiffs also assert state law claims for negligence and negligent infliction of emotional distress against each Defendant. [Dkt. #1].

Plaintiffs allege that this court has personal jurisdiction over each Defendant based on their deliberate and extensive contacts with Washington authorities, and specifically their

---

[5] Massachusetts Executive Office of Public Safety and Security is the umbrella agency for multiple Massachusetts State agencies including: Massachusetts Department of Corrections, Massachusetts State Police, and the Commonwealth Fusion Center.

ORDER - 3

decision to locate and then leave Tavares in Washington. Defendants claim their contacts are insufficient as a matter of law to subject them to personal jurisdiction in Washington State.

## II. BACKGROUND

A. Defendants Knew Tavares Was Dangerous

Daniel Tavares murdered his mother in 1991.[6] He was sentenced to seventeen to twenty years in Massachusetts State prison. Tavares was frequently violent to staff and inmates while in prison, earning the highest available Massachusetts DOC security rating and accumulating at least 120 disciplinary reports. Between 1993 and 2006, eleven of these disciplinary reports resulted in his loss of 4.38 years good time credit. Six additional disciplinary reports for violent actions should have resulted in the loss of an additional 689 days of good time credit.

In a 2006 letter, Tavares made threats against then-Governor Romney and Attorney General Reilly. In February 2006, the Mass. DOC notified the Massachusetts State Police (MSP) about Tavares' violence and threats. Executive Security and the DOC prepared months in advance for Tavares' release. DOC collected information on Tavares' violence, his telephone contact list, and visitor's card, updated photographs of Tavares, and placed him on mail monitor. All of this was in anticipation of future law enforcement requests. In April 2007, Executive Security[7] contacted numerous organizations, including the U.S. Secret Service, MSP, DOC Victim Services, and the Criminal History Systems Board, about Tavares' pending release.

B. Tavares Still Manages to Abscond

In early June 2007, the Worcester DA's Office filed charges against Tavares for assaulting prison staff. Prior to arraignment, police officer Lt. James Hanafin warned Worcester

---

[6] The Plaintiffs' factual allegations are generally found in Dkt. #1; Plaintiffs' Response to Defendants' Motions to Dismiss, Dkt. #45; and Scudder Decl., Dkt. #46.

[7] Many of the documents obtained and submitted by the Plaintiffs contain only the agency name and do not specify the individual agent.

ORDER - 4

ADA Donnelly about Tavares' violence and threats. Tavares was arraigned on June 11, 2007. Donnelly represented the State, and bail was set at $50,000 on each of the two assault charges.

On June 14, 2007, Tavares completed his sentence for the murder conviction, 689 days early. This was a result of the DOC improperly calculating his forfeiture of good time. Mass DOC notified special investigators, DOC Victim Services, and the Bristol County Sheriff's Office about Tavares' release because of his danger to the public. A Superior Court Judge released Tavares on his personal recognizance on June 17, 2007, after he appealed his bail on the two assault charges.[8]

Executive Security remained concerned about Tavares' danger to others. Executive Security met with both the MSP Violent Fugitive Apprehension Section[9] (VFAS) and FAU on July 16 or 17, 2007. Within days, VFAS investigated and learned Tavares had fled Massachusetts. VFAS confirmed that Tavares' stepbrother had driven him to the airport in Providence, Rhode Island, where he boarded a flight to Washington State.

Tavares defaulted in Clinton County District Court on July 23, 2007.[10] The next day two warrants were issued for his arrest. VFAS learned Tavares applied for SS/ID and credit cards using the Washington State address of his "jailhouse wife," Jennifer Tavares. VFAS told Executive Security on July 25, 2007, that it had credible information Tavares was in Washington. Executive Security forwarded this information on to the CFC. VFAS acted on its knowledge by asking the Worcester DA to extradite Tavares from Washington.

---

[8] It is unclear from the parties' briefing where Tavares was located during the interim.

[9] VFAS identifies and arrests the most violent criminals by serving as a liaison and assisting in investigations among Massachusetts and national agencies with the common purpose of apprehension of fugitives.

[10] Plaintiffs do not provide any detail on the nature of this hearing.

ORDER - 5

On August 1, 2007, Executive Security confirmed that Romney was scheduled to be in Seattle on November 19, 2007. VFAS notified Executive Security that it had asked the Worcester DA's office to extradite Tavares from Washington.

C. The Worcester DA's Office Refuses to Extradite Tavares

In late August 2007, Range, of the CFC, and Lochrie, of the FAU, talked multiple times about Tavares' history of violence and the fact he had absconded to Washington. Range discussed with Special Projects Manager Paul Pellegrino at VFAS that Tavares was dangerous, but the Worcester DA did not want to extradite him from Washington. Range located DOC files with Jennifer Tavares' mailing address and phone number in Washington. Range was still concerned about Tavares and he, along with other CFC and VFAS agents, updated the NCIC entry with information on Tavares' known violence, but noted that it was for "officer safety" only.

In September 2007, Range spoke with ADA Donnelly. Donnelly said that the DA's office was not aware of all the information about Tavares when they initially decided not to extradite him and would review the matter. The Worcester DA's Office again refused to take Tavares' danger seriously. The Worcester DA's Office sent a letter to VFAS authorizing Tavares' extradition only from New England states (after VFAS confirmed Tavares was in Washington). The Worcester DA told the CFC about this limited extradition and instructed the CFC to enter it in the NCIC database.

D. Washington Authorities Are Involved

In late September 2007, Range acted on his knowledge of Tavares' potential for violence and his presence in Washington by contacting the Boston FBI. On September 25, the CFC left a message for Sgt. Lance Ladines of the WSP at the Washington Joint Analytical Center

ORDER - 6

(WAJAC) (maintained by the FBI). A few days later, Range followed up with the Boston FBI. Range confirmed that Intelligence Analyst Wells would request that Washington personnel determine whether Tavares had established a permanent residence in Washington, and whether he was engaged in any criminal activity. The FBI agreed to advise Range of Washington's findings.

The Seattle FBI Office received Range's request from Boston the first week of October. WAJAC was asked to physically locate Tavares, but not to arrest him, and determine whether Tavares planned to remain in Washington. Boston FBI picked up a packet on Tavares prepared by Executive Security.

WSP Task Force Officer George Mars spent all of October 24, 2007, surveying Tavares' residence in Graham. A neighbor confirmed seeing Jennifer Tavares, but when shown a photo of Daniel Tavares, he stated that he had never seen him there.

On November 17, 2007, Tavares entered Beverly and Brian Mauck's home and shot them both in the head at close range. The Maucks' murder took place very near where Defendants had located Tavares' jailhouse wife three weeks earlier.

A few days later, unaware of the murders, the CFC confirmed with the Boston FBI that WAJAC's written findings would be sent back to the CFC. These findings included information obtained by WAJAC through Washington databases. On November 20, 2007, the CFC received the FBI's written response from WAJAC about Tavares.

On November 10, 2010, the Plaintiffs filed their complaint. The issue before the Court is whether it has personal jurisdiction over the Defendants on the facts alleged by the Plaintiffs.

## III. PERSONAL JURISDICTION

Plaintiff bears the burden of establishing that personal jurisdiction exists. *Rio Properties, Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (internal citation omitted). Where the 12(b)(2) motion to dismiss is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Schwarzenneger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004) (internal citation omitted). "The plaintiff need only demonstrate facts that if true would support jurisdiction over the defendant." *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995).

Any "uncontroverted allegation in the complaint must be taken as true…[and] [c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1109 (9th Cir. 2002) (internal citations omitted). But, the plaintiff cannot "simply rest on the bare allegations of its complaint." *Amba Marketing Systems, Inc. v. Jobar Int'l Inc.*, 551 F.2d 784, 787 (9th Cir. 1977).

<u>A. Personal Jurisdiction in Washington Comports with Due Process</u>

"Jurisdiction must comport with the state long-arm statute, and with the constitutional requirement of due process. Because the Washington long-arm statute reaches as far as the Due Process Clause, all [the Court] need analyze is whether the exercise of jurisdiction would comply with due process." *Omuluk v. Langsten Slip & Batbygger A/S*, 52 F.3d 267, 269 (9th Cir. 1995) (internal citation omitted). "The Due Process Clause protects an individual's liberty interest in not being subject to binding judgments of a forum with which he has established no meaningful 'contacts, ties or relations.'" *Burger King v. Rudzewicz*, 471 U.S. 462, 471-72 (1985), quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945).

To exercise personal jurisdiction over a non-resident defendant, due process requires the defendant "have certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe*, 326 U.S. at 316 (internal quotations omitted). These minimum contacts make personal jurisdiction foreseeable when the non-resident defendant's connection to, and conduct within, the forum state is such that "he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

B. Specific Jurisdiction in Washington

Defendants lack the "continuous and systematic" contacts of general jurisdiction. *Perkins v. Benguet Consolidate Mining Co.*, 342 U.S. 437, 445, 72 S.Ct. 413 (1952). Plaintiffs argue that Defendants are subject to specific jurisdiction on claims related to their contacts in the forum state. Washington looks at three criteria when determining whether there is specific jurisdiction:

1. Defendants *purposefully availed* themselves of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of its laws;

2. The cause of *action arose from*, or was connected with, such act or transaction;

3. The assumption of jurisdiction must be *reasonable* and not offend traditional notions of fair play and substantial justice.

See *Lee v. City of Los Angeles*, 250 F.3d 668, 692 (9th Cir. 2001).

The question is not whether the individual defendants collectively purposefully availed themselves of the privilege of conducting activities in Washington, but it is instead whether each individual defendant purposefully availed him or herself of the jurisdiction of Washington. *Lee*, 250 F.3d at 693.

### 1. Purposeful Direction Analysis

Because this is a case sounding in tort, not contract, the standard is a "purposeful direction analysis," rather than purposeful availment. *Schwarzenneger*, 374 F.3d at 802 (internal citations omitted).

Purposeful direction is evaluated under the three-part "*Calder*-effects" test. *Schwarzenneger*, 374 F.3d at 803, quoting *Dole Food Co.*, 303 F.3d at 1111. A defendant purposefully directs its activities at the forum state if it has "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.*

### 2. Cause of Action Analysis

The plaintiffs must show that their cause of action arises out of the Defendants' Washington-related activities. The cause of action test is whether "but for" the alleged contacts between the Defendants and Washington, the Plaintiffs' claims would not have arisen. *Lee*, 250 F.3d at 694, citing *Terracom v. Valley Nat'l Bank*, 49 F.3d 555, 561 (9th Cir. 1995).

### 3. Reasonableness of Jurisdiction

"[W]here a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

The Court looks to seven factors in determining whether jurisdiction is reasonable: (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of the conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most

efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Burger King*, 471 U.S. at 476-477; *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998).

C. Direct Coordination of Extradition Proceedings Establishes Personal Jurisdiction

Purposeful availment is established by intentional and continuous contacts between out-of-state authorities and the forum state. In *Lee v. City of Los Angeles*, two New York police officers entered information into the NCIC database and then had extensive contact with California authorities (including visiting the forum state). 250 F.3d 668, 693 (9th Cir. 2001). The Ninth Circuit held that the officers' contacts with the California justice system to accomplish extradition were "deliberate, extensive, aimed at, and had an effect in California." *Id.* at 694. It therefore held California had personal jurisdiction over the two New York officers. *Id.*

When an out-of-state DA's office coordinates extradition with forum state authorities, it invokes the benefits and protections of the forum state's laws. In *Maney v. Ratcliff*, a Louisiana DA and ADA entered information into the NCIC database and told Wisconsin authorities Louisiana wanted to extradite the plaintiff and would send the necessary papers. 399 F.Supp. 760, 769 (D. Wis. 1975). The attorneys sent the Wisconsin authorities a telegram asking them to arrest the plaintiff and notify Louisiana when the arrest was completed. *Id.* The District Court held that personal jurisdiction was appropriate in Wisconsin because the attorneys engaged directly with Wisconsin authorities for arrest and extradition, invoking the benefits and protections of Wisconsin law. *Id.*

Even without substantial direct contacts with the forum state, purposeful availment can exist when a party relies on the forum state. *See*, *e.g.*, *Ballard v. Savage*, 65 F.3d 1495, 1497 (9th

Cir. 1995). There, an Austrian bank did not advertise or significantly solicit business in the U.S., but it depended on California residents for a substantial amount of its business. *Ballard*, 65 F.3d at 1497. The Ninth Circuit held the Austrian bank purposefully availed itself of California State law because it intentionally relied on California residents for well over half its business. *Id.* at 1499.

D. Use of the NCIC Database and Unsolicited Acts by the Forum State Are Insufficient for Personal Jurisdiction

An on-going relationship distinguishes between random, fortuitous contacts and purposeful availment. In *Cook v. Holzberger*, a Michigan sheriff arrested the plaintiff based on an Ohio warrant in the NCIC database. 788 F. Supp. 347, 351 (D. Ohio 1992). He then spoke to Ohio authorities about extradition. The Southern District Court of Ohio held that this limited contact, without an on-going relationship with the forum state, did not constitute purposeful availment. *Id.*; *See also Snyder v. Snyder*, U.S. Dist. WL 894415, at *4 (D. Minn. 2007);[11] *Williams v. Ponder*, U.S. Dist. WL 3152129, at *4 (D. Penn. 2009).[12]

E. Personal Jurisdiction Over Defendant Range

Plaintiffs allege that personal jurisdiction over Range is appropriate because of his relationship with Washington authorities and his involvement in the decision to leave Tavares in Washington. [Dkt. #1, p. 9, 12, 14, 19, 23; Dkt. #45, p. 9-10; Dkt. #46, Exh. C, D].

Range denies entering the New England extradition into the NCIC database or being involved in the decision to not extradite Tavares from Washington. Range admits using the

---

[11] Holding that Colorado authorities' NCIC database entry followed by a fax between Colorado and Minnesota authorities was not a purposeful availment of the benefits and protections of Minnesota.

[12] Holding that a Georgia ADA's request that Governor of Georgia ask that Pennsylvania extradite the plaintiff was a significantly more tenuous connection "than the direct coordination of extradition proceedings found in *Lee* and *Maney*."

Boston FBI as a liaison with Washington State, but denies directly contacting anyone in Washington. Range alleges that he did not know Tavares was actually in Washington State until November 19, 2007, when he learned of Tavares' arrest for the Maucks' murder. [Dkt. #28, Range Decl.].

Plaintiffs' factual allegations regarding Defendant Range's conduct support personal jurisdiction over him. As a CFC employee, Range deliberately acted on behalf of Burke (the Secretary of Executive Security) and made substantial contacts with Washington (through the FBI). While Range did not travel to the forum state as the defendants did in *Lee*, he nevertheless had extensive and deliberate contacts with Washington. 250 F.3d at 698. Range requested and received Washington's cooperation in his investigation of Tavares. Range's contacts were not of the impersonal and nonspecific variety. He did not simply input information into the NCIC database. Instead, he used the FBI to rely on the work of WSP. Similar to the defendants in *Maney*, Range invoked Washington law by engaging WSP (through the FBI chain of command) to gain information on Tavares' whereabouts and activities in Washington. [Dkt. #1, p. 14, 23; Dkt. #45, p. 10; Dkt. #46, Exh. D]; 399 F.Supp. at 769.

Range expressly aimed his actions at Washington with his involvement in the decision to leave Tavares in Washington. Range solicited and relied on the work of Washington authorities. He instructed the FBI and WSP not to arrest Tavares because the Worcester DA would not extradite Tavares to Massachusetts. Yet he relied on the WSP to obtain a variety of information on Tavares' activities in Washington. As the Austrian bank relied on California customers for its business in *Ballard*, Range purposefully relied on the work of the WSP, but ensured Tavares would not be sent back to Massachusetts. [Dkt. #1, p. 9, 14]; 65 F.3d at 1499.

ORDER - 13

Range's actions caused a harm that he knew was likely to occur. He told the DA's office that Tavares was dangerous and in Washington. Range (along with Lochrie and Donnelly) then chose to leave Tavares in Washington without any reasonable precautions such as supervision, monitoring, or warning citizens in his vicinity.

But for the decision to leave Tavares in Washington, unsupervised and without any warning to those around him, Beverly and Brian Mauck would not have been subject to Tavares' violence. Range's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.

F. Personal Jurisdiction Over Defendant Donnelly

Plaintiffs allege that personal jurisdiction over Donnelly is appropriate because she knew Tavares was dangerous and in Washington, but she declined multiple times to extradite him to Massachusetts. All the while, Donnelly was in contact with the FBI about Tavares' location in Washington.

Donnelly argues that she told her supervisor at the Worcester DA's Office about Range's concerns, but she was not involved in extradition decisions. Donnelly denies any involvement with Tavares' NCIC entry. Donnelly also denies contacting the FBI or Washington authorities. [Dkt. #29, Defendants' Motion to Dismiss; Dkt. #31, Donnelly Decl.].

Plaintiffs' allegations regarding Defendant Donnelly's conduct support this Court's personal jurisdiction over her. Donnelly deliberately refused to extradite Tavares *multiple times* after state agents told her Tavares was believed to be in Washington.[13] Despite this credible information, the Worcester DA's office expanded extradition only to the New England states.

---

[13] In late July 2007, VFAS contacted Donnelly seeking authorization to extradite Tavares from Washington. [Dkt. #46, Exh. C]. Two months later Range told Donnelly about the danger of Tavares and was told that the DA's office was unaware of this and would review its decision to not extradite Tavares. [Dkt. #1, p. 22].

ORDER - 14

Donnelly told the CFC to enter this revised extradition into the NCIC database. She then contacted the FBI about Tavares' location in Washington. [Dkt. #1, p. 9, 23; Dkt. #45, p. 9-10].

Donnelly's actions were aimed at Washington when she purposefully limited Tavares' extradition to New England, thousands of miles away from Washington, where she had been told he was located. Donnelly caused a harm that she knew was likely to occur in Washington when she left a violent criminal on the loose, free to harm those around him; despite her knowledge that Tavares was in Washington and dangerous. As did the DA and ADA in *Maney*, Donnelly invoked the benefits and protections of Washington law by instructing WSP (through the FBI) that Tavares was *not* to be extradited to Massachusetts. [Dkt. #45, p. 9-10; Dkt. #46, Exh. C]; 399 F.Supp. at 769.

But for Donnelly's decision to not extradite Tavares and her contact with the FBI about leaving Tavares in Washington, Beverly and Brian Mauck would not have been subject to the danger of Tavares. Donnelly's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.

G. Personal Jurisdiction Over Defendant Burke

Plaintiffs allege that personal jurisdiction over Burke is appropriate because of his agents' actions. As Secretary of Executive Security, he had knowledge of, directed, participated in, and authorized his agents' investigations of Tavares and their reliance on the FBI and WSP to locate and then leave Tavares in Washington. [Dkt. #1, p. 10; Dkt. #45, p. 9, 24].

Burke argues that he was not directly involved in the day-to-day operations of the Massachusetts DOC, the MSP, or the CFC. Burke denies investigating Tavares prior to the murders of the Maucks. Burke denies making any extradition decisions. Lastly, Burke contends that he had no contact with (or directed his agents to contact) Washington authorities about Tavares. [Dkt. #29, 30].

A corporation may be held under jurisdiction of the forum state where its agents operate. *International Shoe Co. v. State of Wash.*, 326 U.S. 310, 314, 665 S.Ct. 154, 90 L.Ed. 95 (1945). A supervisory position alone is not sufficient. "The supervisor must be directly and actively involved in activities in the forum state." *Wag-Aero, Inc. v. United States*, 337 F.Supp. 1479, 1485 (E.D. Wis. 1993), *aff'd* 35 F.3d 569, 1994 WL 485810 (7th Cir. 1994).

Plaintiffs' factual allegations regarding Defendant Burke's conduct support this Court's personal jurisdiction over him. Burke initiated an investigation about Tavares' threats against Romney. Burke, through his agents, told VFAS and FAU about Tavares' release, and asked VFAS to investigate Tavares. Range acted on behalf of Burke to establish an ongoing relationship with Washington authorities (through the FBI).[14] [Dkt. #1, p. 10, 14, 23; Dkt. #45, p. 10; Dkt. #46, Exh. C, D, E].

Burke's actions were expressly aimed at Washington because after VFAS informed Executive Security of credible information that Tavares was in Washington, Executive Security confirmed Tavares' location. Executive Security decided to leave Tavares in Washington by specifically limiting his extradition to New England. [Dkt. #1, p. 10].

Burke's actions caused harm in Washington that he knew was likely to occur because he knew Tavares was dangerous. So much so that he informed VFAS and the CFC about Tavares release' and he requested VFAS track down Tavares. [Dkt. #1, p. 10; Dkt. #46, Exh. C, E].

Burke purposefully availed himself of the privileges and benefits of Washington State law when he directed his agents to investigate Tavares, located him in Washington, and then willfully decided to leave him there. Burke's Motion to Dismiss for Lack of Personal Jurisdiction is DENIED.

---

[14] Range, as an employee of the CFC, worked under the umbrella agency Executive Security.

H. Personal Jurisdiction Over Defendant Lochrie

The Plaintiffs allege that personal jurisdiction over Lochrie, a FAU employee, is appropriate because of his extensive contact with Defendant Range and the FBI about Tavares. [Dkt. #1, p. 14, 19, 21-23; Dkt. #29, p. 22].

Lochrie denies any involvement in the DOC's calculations of Tavares' "good time" deductions. Lochrie denies any contact with the FBI or Washington authorities regarding Tavares. Lochrie argues that he had no involvement in extradition decisions. [Dkt. #32].

Plaintiffs' factual allegations regarding Defendant Lochrie's conduct do not support this Court's personal jurisdiction over him. Plaintiffs provide extensive detail of Lochrie and Range's conversations about Tavares. But, Plaintiffs do not provide any details about Lochrie's alleged contact with the FBI (or WSP) about Tavares. [Dkt. #1, p. 14, 19, 21-23; Dkt. #29, p. 22].

Plaintiffs do not make sufficient allegations to take Lochrie's actions beyond that of a mere impersonal and nonspecific connection through the NCIC and Defendant Range. Though the Plaintiffs allege that Lochrie acted in furtherance of the warrant in the NCIC to contact the FBI, this is a blanket allegation without any specificity of a deliberate act aimed at Washington, causing harm Lochrie knew was likely to occur. In *Snyder*, the District Court held that there was not personal jurisdiction when the plaintiff only made a bare and generalized allegation of contact with the forum state. U.S. Dist. WL 894415, at *4 (D. Minn. 2007).

Similar to *Cook*, there are no allegations that Lochrie had an ongoing relationship with Washington authorities. 788 F.Supp. at 351. Lochrie's contacts with Washington are tenuous and do not demonstrate the "direct coordination" see in *Maney* or *Lee*. *Maney*, 399 F.Supp. at 769; *Lee*, 250 F.3d at 693.

ORDER - 17

Because there is not a sufficient allegation of Lochrie's directed behavior at Washington, it is not necessary to examine whether the harm arose out of his behavior or whether personal jurisdiction would be reasonable in this circumstance. Defendant Lochrie's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED.

## V. CONCLUSION

The traditional rule is that the claim or cause of action arises where the injury occurs and the harm of the Defendants' actions has been felt in Washington. *Maney*, 399 F.Supp. at 767. Washington's personal jurisdiction over Defendants Range, Donnelly, and Burke is reasonable because they purposefully interjected themselves into Washington State's affairs by relying on WSP, all the while ensuring that Tavares would not be returned to Massachusetts. Two Washington residents were subjected to Tavares' violence due to the Defendants' actions. Washington will be an efficient forum for adjudication of this dispute because of the location of witnesses in Washington. The burden on the Defendants of defending in Washington is not unreasonable, particularly in light of the great interest Washington has in adjudicating this dispute. Defendants Range, Donnelly, and Burke's Motions to Dismiss for Lack of Personal Jurisdiction are DENIED. Defendant Lochrie's Motion to Dismiss for Lack of Personal Jurisdiction is GRANTED.

**IT IS SO ORDERED.**

Dated this 22nd day of July, 2011.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE